RENE L. VALLADARES
Federal Public Defender
Nevada State Bar No. 11479
ALLIE WILSON
Assistant Federal Public Defender
New York State Bar No. 5479597
200 S. Virginia Street, Suite 340
Reno, Nevada 89501
(775) 321-8451/Tel.
(702) 388-6261/Fax
allie_wilson@fd.org

Attorney for Nathan Michael Keays

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No. 3:20-cr-00085-GMS-MMS-2 |
| vs. | |
| NATHAN MICHAEL KEAYS, | |
| Defendant. | |

**Defendant's Supplemental Motion for a New Trial Pursuant to Federal Rules of Criminal Procedure 25 and 33**[1]

Nathan Keays, by and through undersigned counsel, hereby supplements his motion for a new trial, filed April 25, 2024. *See* ECF No. 296. Mr. Keays' motion argued for a new trial pursuant to Federal Rule of Criminal Procedure 33. He additionally moved for a judgment of acquittal. *See*

---

[1] The defense previously filed this supplemental motion on May 30, 2025, under seal at ECF No. 382. Pursuant to the Court's order denying Mr. Keays' motion to seal, *see* ECF No. 384, the defense now refiles the motion on the public docket. The defense, however, seeks leave to file Exhibits 1-9 under seal, as addressed in a separately filed motion to seal.

ECF No. 297. Neither motion was resolved before the resignation of former Judge Joshua Kindred.[2] Both motions remain pending and were subject to a stay until the stay was lifted by the Court on May 5, 2025. In light of factual developments since the filing of his original motion, Mr. Keays now supplements his motion with additional arguments supporting a new trial pursuant to Rules 33 and 25 of the Federal Rules of Criminal Procedure.

## I.     Introduction

Mr. Keays proceeded to trial in this matter in March 2024. The trial lasted three weeks. In the second week of trial, Judge Kindred took a day off from trial. Mr. Keays was later found guilty on all counts.

Unbeknownst to Mr. Keays at the time, Judge Kindred had taken a day off to testify before the Judicial Council of the Ninth Circuit ("Judicial Council") about allegations of sexual misconduct. In fact, he took a day off and committed perjury before the Judicial Council when he claimed, under oath, that he never engaged in sexual misconduct. Judge Kindred is now known to have engaged in sexual contact with his former law clerk, who was employed at the time by the U.S. Attorney's Office. He also exchanged nude photographs with another senior Assistant U.S. Attorney and engaged in flirtatious texting with a CJA defense attorney who regularly appeared

---

[2]     Although Judge Kindred resigned on July 3, 2024, he was an active judge during the relevant period. This motion, therefore, will refer to him as Judge Kindred.

before him. Judge Kindred resigned, two months after Mr. Keays' trial concluded, with Mr. Keays' post-trial motions still pending before him.

Judge Kindred's misconduct alone warrants a new trial here. Mr. Keays faces the likelihood of a multi-year jail sentence. To allow Mr. Keays' verdict to stand, even though the presiding judge committed perjury in the middle of his trial, would deteriorate public trust in the judicial system.

But it is not only Judge Kindred's conduct that calls these proceedings into question. The AUSA with whom he is known to have exchanged nude photographs, AUSA Karen Vandergaw, played at least a behind-the-scenes role in Mr. Keays' prosecution. And she acknowledges that she may have attended some of the proceedings—at least, she believes she attended the opening statement. Unfortunately, Mr. Keays does not benefit from continuity of counsel because he ran out of funds to continue paying the private counsel who represented him at trial. The undersigned counsel was not trial counsel and, therefore, cannot say when and how often AUSA Vandergaw attended trial. AUSA Vandergaw, like Judge Kindred, is known to have lied in the course of the investigations into Judge Kindred's and her own misconduct. She is further described by her superior at the U.S. Attorney's Office as a "liar." Her word cannot be trusted.

That is not all. The threads of this story get ever more complicated because AUSA Vandergaw is engaged to AUSA Klugman, one of the trial attorneys in this matter and an attorney of record until his removal in October 2024, no doubt because his relationship with AUSA Vandergaw implicates him in this scandal. He took a lead role in this matter, including by authoring

3

most of the pretrial motions, presenting the opening statement, and examining one of the government's key witnesses. AUSA Klugman also has a reputation for dishonesty amongst his superiors at the U.S. Attorney's Office.

With a judge who perjured himself mid-trial and involvement by two Assistant U.S. Attorneys who are described as dishonest, both the appearance and reality of a fair trial and the impartial administration of justice are lost. A new trial is a reasonable, middle-ground approach that protects Mr. Keays' constitutional rights to a fair trial and impartial judge, the public's confidence in the judicial system, and the government's discretion in its prosecutions.

A new trial is warranted here.

## II. Factual Background

### A. The Relevant Parties

This matter was originally charged almost five years ago. Nearly all the players have changed since then. Between Mr. Keays trial and the instant supplemental motion, the only player that remains the same is a single Assistant U.S. Attorney. Judge Kindred was replaced following his resignation. Mr. Keays' defense counsel has been replaced. AUSA Klugman been replaced.

The case was originally indicted by former AUSA Charisse Arce and current AUSA Michael Heyman. Only the latter remains an attorney of record. The former was replaced by AUSA Klugman on January 9, 2024, *see* ECF No. 177, who remained an attorney of record throughout trial but who was replaced after news of the scandal surrounding Judge Kindred broke. Other

attorneys from the U.S. Attorney's Office were involved in behind-the-scenes elements of the case, including AUSA Karen Vandergaw. *See supra* Section II.F.2.

Mr. Keays hired private counsel, who represented him through September 2024. However, when the possibility of significant post-trial litigation arose following Judge Kindred's resignation, Mr. Keays no longer had the funds to continue with his chosen counsel. He was assigned the undersigned court-appointed counsel for all subsequent proceedings.

The presiding judge also changed. The case was originally assigned to Judge Burgess. On November 28, 2022, Judge Kindred replaced Judge Burgess. Judge Kindred remained the presiding judge until his resignation on July 3, 2024. Mr. Keays' case was one of many to be reassigned following Judge Kindred's resignation.

## B. Pre-Trial Litigation

Mr. Keays and his co-defendant, Forrest Wright, were originally charged by criminal complaint on August 26, 2020. ECF No. 1. Both defendants were indicted in September 2020 in a 34-count indictment charging wire fraud and money laundering. ECF No. 8. The charges relate to a scheme to defraud ConocoPhillips by using a corporate entity owned by Mr. Keays to contract for goods and services that were never provided. Mr. Keays has always disputed that he was aware of the fraud.

By the government's own account, Mr. Wright was the brains behind the scheme. *See, e.g.*, ECF No. 219 (Government Trial Brief). Mr. Wright was employed by ConocoPhillips. *Id.* at 2.

The government describes that, "Mr. Wright had the requisite knowledge and authority within Conoco to formulate the plan" and facilitate the requisite contracts. *Id.* Mr. Wright recruited Mr. Keays to use Mr. Keays' existing business, Eco Edge, to contract with ConocoPhillips. *Id.* at 2-3. Mr. Wright then submitted false information to ConocoPhillips to facilitate a contract between ConocoPhillips and Eco Edge. *Id.* According to the government, Mr. Wright ghostwrote emails for Mr. Keays to send to Mr. Wright's ConocoPhillips email address because "[Mr. Wright] knew what goods and services Conoco required and Eco Edge was the necessary front to trick Conoco into believing that Eco Edge was a legitimate vendor providing goods and services." *Id.* at 4. Mr. Wright facilitated the bid approval and contract award to Eco Edge. *Id.* Over the next eight months, ConocoPhillips paid out millions of dollars for materials and labor that were never provided—this, at least, is undisputed.

Yet, despite Mr. Wright's seemingly greater culpability, the government quickly reached an agreement with Mr. Wright to testify against Mr. Keays. Mr. Wright pleaded guilty in March 2021. He would later serve as the government's star witness against Mr. Keays, and their only witness as to what Mr. Keays actually knew about the scheme.

In the several years that followed, two related cases proceeded. One, a civil case, promptly resolved with respect to Mr. Keays. *See ConocoPhillips Alaska Inc. v. Wright, et al.*, Case No. 3:19-cv-311-SLG (Sept. 24, 2021), ECF No. 68, 104, 108. Mr. Keays disclaimed his interest in the funds in multiple banks accounts and properties that he acknowledged were either illegitimate

funds received from ConocoPhillips or purchased with such funds. *Id.* ECF No. 68. He also liquidated his retirement fund to reimburse ConocoPhillips. *Id.* ECF No. 104. In total, he returned the approximate value of the illegitimate funds he received from the alleged scheme. Mr. Wright defaulted in that same civil matter, and a default judgment was entered against him for $4.2 million. *See ConocoPhillips Alaska Inc. v. Wright, et al.*, Case No. 3:19-cv-311-SLG (Jan. 28, 2022), ECF No. 126.

This related criminal case continued for several years beyond the resolution of the civil case. As the parties neared trial, both sides filed numerous motions in limine. Mr. Keays filed at least three motions in limine prior to trial, all of which were opposed by the government. ECF No. 209-211, 216-18. The government filed six motions in limine, three of which were opposed by Mr. Keays. ECF Nos. 199-203, 207-08, 212, 242. Except for one motion in limine, all pretrial motion practice was handled by AUSA Klugman. Judge Kindred granted all the government's motions in limine. ECF No. 236, 281. He denied all of Mr. Keays' motions in limine. *Id.*

Among those motions was one filed by the government that precluded Mr. Keays from presenting a key piece of his defense: that he reimbursed ConocoPhillips for the approximate value of his ill-gotten gains in connection with the civil matter. ECF No. 201, 208. The issue was of such importance to Mr. Keays' case that, mid-trial, Mr. Keays also filed a motion to admit evidence on the same point. ECF No. 269. Mr. Keays intended to use this as evidence that he was an unknowing participant in Mr. Wright's scheme because, upon learning that his gains were illegitimate, Mr.

7

Keays promptly and cooperatively returned the funds to the best of his ability. As Mr. Keays asserted, "[e]vidence of his immediate cooperation with ConocoPhillips to liquidate assets, as well liquidating his own retirement funds, tends to show that Mr. Keays had no intention of keeping funds not earned." ECF No. 208 at 2. Mid-trial, Judge Kindred granted the government's motion to preclude this evidence, and denied Mr. Keays' motion to admit the same evidence. ECF No. 281, 284.

### C. Trial

Trial in this matter began on March 25, 2024, and ran from Monday through Thursday for the following three weeks. For reasons unbeknownst to Mr. Keays at the time, former Judge Kindred took a day off from trial on April 4, 2024. It is now known that Judge Kindred testified before the Judicial Council on Friday, April 5, 2024. It is also now known that Judge Kindred lied under oath before the Judicial Council while presiding over Mr. Keays' trial. *See supra* Section II.E.

At trial, Mr. Keays argued that he was unaware of Mr. Wright's intent to defraud ConocoPhillips. *See* ECF No. 258 at 5-6. He believed that while his company, Eco Edge, was the contracting party with ConocoPhillips, Mr. Wright's company, Spectrum Consulting, was acting as a subcontractor to provide the supplies and perform the labor. *Id.* Although he acknowledged that he knew that such a contractor-subcontractor arrangement violated ConocoPhillips policies, and therefore would not have been approved by ConocoPhillips, that arrangement would not

violate the law, assuming that Spectrum Consulting was actually providing the contracted goods and services. *Id.* Mr. Keays also acknowledged at trial that he had signed off on invoices and other documents and received money from ConocoPhillips, much of which he then distributed to Spectrum Consulting as the subcontractor. *Id.* at 7-8. However, Mr. Keays maintained that he was unaware that Spectrum Consulting was not, in fact, providing the contracted goods and services. *Id.*

In response to Mr. Keays' defense, and long after the close of the government's case, the government proposed a new jury instruction on deliberate ignorance. While the government's case attempted to portray Mr. Keays as a willful participant in the fraudulent scheme, the government pivoted to propose an alternate theory by way of a new jury instruction: that Mr. Keays "deliberately avoided learning the truth." ECF No. 291 at 20. Mr. Keays objected to this jury instruction, ECF No. 279; yet, Judge Kindred included it in the final instructions.

Mr. Keays was found guilty on all counts that pertained to him.

### D. Post-Trial Litigation

After the jury reached a verdict, Mr. Keays moved for a judgment of acquittal and for a new trial. ECF No. 296, 297. Mr. Keays' argued in part that (1) Mr. Wright's testimony was not credible and (2) that the Court should have allowed Mr. Keays to present evidence on the liquidation of his assets to reimburse ConocoPhillips. ECF No. 296 at 2-8. Specifically, Mr. Keays pointed to numerous elements of Mr. Wright's testimony that challenged his credibility:

9

- an admitted record of pathological lying;
- a record of lying to Federal Agents;
- a record of profound drug and alcohol abuse during the relevant time, with admitted lack of memory as to the essential conversations and acts that would substantiate the alleged fraudulent scheme;
- impaired recollection as a result of a history of drug and alcohol abuse;
- a history of lying to get drugs and engage in criminal conduct for drugs (Doc. 268 at 127);
- testimony by witnesses as well as the Government's own investigating agent that Forrest Wright is not trustworthy;
- a sweetheart deal with the Government to testify against Keays in exchange for a substantial assistance motion by the Government and other plea benefits, said benefits conditioned on Wright testifying consistent with a script;
- his admission that he lied to Keays, his wife, and his father-in-law, to defraud Conoco.

ECF No. 296 at 3-4.

Judge Kindred never resolved the post-trial motions prior to his resignation. Both were subject to a stay pending investigation into wrongdoings by Judge Kindred and any other party relevant to this matter. ECF No. 322. Both motions remain pending.

### E. Judge Kindred's Resignation

On July 5, 2024, with Mr. Keays' post-trial motions still pending before him, Judge Kindred resigned. Within days, the reason became clear. The Judicial Council unsealed a report, issued May 23, 2024, in which it found that Judge Kindred "engaged in misconduct by having an inappropriately sexualized relationship with one of his law clerks" both while in his employ and afterwards while in the employ of the U.S. Attorney's Office and that "throughout [the proceedings

10

of the Judicial Council], Judge Kindred lied to the Chief Judge, the Special Committee, and the Council." *See In re Complaint of Judicial Misconduct*, Case No. 22-90121 (9th Cir. Judicial Council, May 23, 2024) at 1.[3]

The Judicial Council addressed three claims of sexual misconduct, one involving physical interactions with one of his law clerks, one involving an exchange of nude photographs with "a separate, more senior AUSA" (now known to be AUSA Karen Vandergaw), and one involving receipt of "sexually suggestive text messages from a local attorney who regularly appeared before him." *Id.* at 16, 21-23, 25. Judge Kindred lied to the Special Committee conducting the investigation with respect to the allegations until confronted by the Judicial Council with contemporaneous evidence of his improper relationships. *Id.* at 24-25. That confrontation occurred on April 5, 2024, two weeks into Mr. Keays' trial.

The Judicial Council found that the sexual misconduct called his integrity into question:

"Judge Kindred's two physical interactions with the law clerk are severe enough to cause the public to question his honesty, integrity, impartiality, temperament, and fitness to serve as a judge. This behavior contravenes the existing standards of behavior for judges and raises serious concerns about the public's confidence in the integrity of the judiciary which, in turn, implicates the effective and expeditious administration of the business of the courts."

---

[3]     The Judicial Council's public report is available at https://cdn.ca9.uscourts.gov/datastore/ce9/2024/22-90121%20News%20Release%20&%20Order%20and%20Certification.pdf.

11

*Id.* at 23. It further found that Judge Kindred's attempt to lie to conceal his wrongdoings was an additional breach of judicial ethics: "[l]ying to the Committee represents an egregious breach of judicial ethics. The public and the judiciary expect judges to be honest and truthful, and Judge Kindred has fallen far short of that unambiguous expectation." *Id.* at 26.

What emerged from the investigation into Judge Kindred's sexual misconduct was not merely a judge who was sexually inappropriate with attorneys. It is a judge who routinely crossed ethical lines in ways that impacted criminal defendants who appeared before him. In one instance, he granted a motion by a defense attorney seeking immunity for a witness in a criminal case because the attorney "wore a low-cut blouse while they sat together on the flight." Ex. 1 at 3. In another, he intervened to resolve a case involving a *pro se* litigant by way of a time served plea agreement simply because he wanted the litigant—a prolific *pro se* filer—off his docket. Ex. 2 at 12-19. [4]

### F. Follow-up Investigations

Multiple investigations arose in the aftermath of Judge Kindred's resignation. One, by the Office of Professional Responsibility of the Department of Justice ("OPR"), inquired into ethical

---

[4]     Mr. Keays sought to depose Judge Kindred in furtherance of this investigation. However, Judge Kindred avoided service of a deposition notice for several weeks, at multiple known locations, including his home address. He eventually spoke with a defense investigator by phone and asked that the notice of deposition be mailed to his home. However, despite repeated attempts to send the notice via certified mail, the mailing was never accepted. He has not responded to any attempts to reach him since.

violations by an employee of the U.S. Attorney's Office implicated in Judge Kindred's misconduct. Another has been piecemeal, conducted case-by-case by a specially-appointed Assistant U.S. Attorney in response to litigation by defendants—including Mr. Keays—who found themselves before Judge Kindred and who are questioning the fairness of their proceedings given that the "honesty, integrity, impartiality, temperament, and fitness to serve" of their presiding judge is in question. *Id.* at 23. At least a dozen people have been interviewed across these investigations, including many employees of the U.S. Attorney's Office from various levels of leadership within that office.

The results of those investigations and related interviews impugn the integrity of two individuals involved in Mr. Keays' case: AUSAs James Klugman and Karen Vandergaw.

### 1. AUSA James Klugman

AUSA Klugman was one of two Assistant U.S. Attorneys who tried the case. He was an attorney of record from January 2024 through October 2024. He participated in all trial-related litigation. Most pretrial in limine motion practice was authored by AUSA Klugman. *See infra* Section II.B. He gave the opening statement at trial. ECF No. 259. He examined the government's primary witness, Forrest Wright. ECF No. 267. He authored responses to Mr. Keays' post-trial motions. ECF No. 299, 300.

Importantly, AUSA Klugman is engaged to AUSA Vandergaw. There is significant evidence that the two commenced their romantic relationship long before it was disclosed despite

13

the fact that AUSA Klugman, then the Criminal Chief, was AUSA Vandergaw's superior within the U.S. Attorney's Office and therefore had a reporting obligation with respect to inter-office romantic relationships. *See* Ex. 3 at 67-68, 146-58; Ex. 4 at 111-17. Even when AUSA Vandergaw moved in with AUSA Klugman, around December 2023, AUSA Klugman denied that there was any intimate relationship to report. *See* Ex. 3 at 145-46. Even as the two planned a holiday in Hawaii together, he denied that there was any intimate relationship to report. *See* Ex. 5 at 140-141.

AUSA Klugman engaged in other instances of dishonesty in connection with his relationship with AUSA Vandergaw. For example, AUSA Vandergaw was promoted to the position of Senior Litigation Counsel in September 2023, during AUSA Klugman's tenure as Criminal Chief. AUSA Klugman claims that he had no input in that promotion. *See* Ex. 5 at 126. He also claims that he never recommended AUSA Vandergaw for the position of Deputy Criminal Chief, the next in line below him as the Criminal Chief. Yet, two of AUSA Klugman's superiors attribute AUSA Vandergaw's promotion to AUSA Klugman's insistence. *See* Ex. 3 at 64 ("James said, the only choice for Deputy is Karen Vandergaw. It really can't be anyone else in the office…I need it to be Karen."); Ex. 4 at 44 ("[Klugman] insisted that [Vandergaw] was the only person qualified in the office to be the deputy criminal chief…and that I had to appoint her as deputy.").

AUSA Klugman's lack of candor ultimately resulted in his demotion. *See* Ex. 3 at 162. When Kate Vogel, the First Assistant U.S. Attorney, was asked directly about whether AUSA Klugman would mislead or lie, she stated:

> "I worry about his honesty…I don't feel like I've experienced honesty from him. So yes, I…guess I would not put it past him to be dishonest."

*See* Ex. 3 at 165. S. Lane Tucker, the U.S. Attorney for the District of Alaska, gave a similar opinion of AUSA Klugman, describing him as "not truthful," lacking "candor," and without the impartiality one expects from a prosecutor:

> I'd say he's not truthful or—and does not have candor. I felt like many conversations we had about [case]-related things, I felt like he was hiding the ball. Because his explanations made no sense….it just seemed like he was trying to avoid giving me certain information….So certainly candor was a problem. And you know, I question his honesty. If he's not being honest and fully forthright in questions that I'm asking him and transparent, I feel like that implicates honesty…I think he clearly had his own agenda. He seemed to have real—in certain cases, he seemed to have real—I don't know if I'd say animus. I don't know if I'd go that far. But he was bound and determined to retry and convict this particular defendant whose sentence was vacated. He had a real bone to pick with him. And whether that was because of something that occurred during the trial, whether it was because his ego was offended because the judge vacated the sentence, I have no idea. At the same time, there was another defendant—should have been a defendant who was never charged for some inexplicable reason…And the few cases that came to my attention, I'm like, this seems like you have some sort of personal…vendetta's too strong a word. But you're not looking at this in a really objective sort of overarching way. You've got a real bone to pick with this guy. You're giving this guy a free pass. You know, there was no rhyme or reason from what I viewed as like, a prosecutorial perspective, he'd sort of treat people, different defendants, differently.

Ex. 4 at 128-130.

AUSA Klugman says that AUSA Vandergaw moved into his home in December 2023 and that his romantic relationship with AUSA Vandergaw began around January 2024. *See* Ex. 5 at 140-41. He was demoted around December 2023.

Mr. Keays trial began approximately three months later, in March 2024, with AUSA Klugman as one of two trial attorneys. AUSA Klugman claims that he never discussed Mr. Keays'

case with his then live-in girlfriend (AUSA Vandergaw) or used her connection with Judge Kindred. *See* Ex. 5 at 44-45, 69. He further claims that Judge Kindred would have no reason to know of his relationship with AUSA Vandergaw despite the fact that the entire staff of the criminal division of the U.S. Attorney's Office seems to have been aware for months prior. Ex. 3 at 146.

### 2. AUSA Karen Vandergaw

AUSA Karen Vandergaw also played a role in Mr. Keays' prosecution, although it was less substantial. She served as the "privilege filter" attorney, reviewing Mr. Keays' personal emails to filter out any attorney-client correspondence before disclosure to the trial team. She likely attended court proceedings as well. At least, she acknowledged that she may have attended court to observe AUSA Klugman's opening statement "or something," but she could not recall exactly when she attended. Ex. 6 at 86, 88.

Mr. Keays, of course, does not have the benefit of continuity of counsel because this post-trial litigation exhausted his funds for private counsel. Undersigned counsel was not trial counsel, was not present during trial, and cannot say when AUSA Vandergaw observed Mr. Keays' trial.

AUSA Vandergaw denies any further involvement in Mr. Keays' case. She further denies discussing the case with AUSA Klugman, with whom she cohabitated at the time. Ex. 6 at 86.

However, AUSA Vandergaw's repeated dishonesty is already a settled matter. AUSA Vandergaw lied to the Judicial Council and to OPR. OPR issued findings against her that included a finding that she "intentionally misrepresent[ed] to OPR and the Judicial Council investigators

16

the actual nature of her interactions and the full scope of her relationship with the judge." *See*

Office of Professional Responsibility, 2025 Investigative Summary 3 (March 19, 2025),

https://www.justice.gov/opr/2025-investigative-summary-3.

In summary, AUSA Vandergaw claimed in response to an initial inquiry by OPR: "I do

not now, nor have I ever had, a romantic, intimate, or close personal relationship with Judge

Kindred. I have not sought such a relationship with Judge Kindred. My relationship with Judge

Kindred has always been courteous, but professional." Ex. 7. A year and a half later, after the

release of the Judicial Council's report referencing an exchange of nude photographs between

Judge Kindred and a then-unnamed "senior AUSA," AUSA Vandergaw gave a completely

different account to OPR, and admitted that she exchanged numerous nude photographs with Judge

Kindred over a period of months. Ex. 8. She further acknowledged that these messages were

exchanged over Signal because that application does not store messages. *Id.* There is, therefore,

no written record that would reveal the full extent of her communications with Judge Kindred.

Even after the extent of her relationship with Judge Kindred became a matter of public

knowledge, AUSA Vandergaw refused to acknowledge how her actions violated her professional

responsibilities. *See* Ex. 9 at 203-214. When asked whether she thought an "attorney who sent

nude photos to a judge shouldn't participate in a case that the judge is handling," AUSA

Vandergaw stated, "I just don't know the answer to that." Ex. 9 at 204-214. When asked whether

a defendant would have a right to know that a prosecutor and the presiding judge were exchanging

nude photographs, AUSA Vandergaw similarly stated that she does not know "whether there's a right to it or not." Ex. 9 at 210.

As with AUSA Klugman, AUSA Vandergaw has a reputation for dishonesty within the U.S. Attorney's Office. First Assistant U.S. Attorney Kate Vogel stated, quite bluntly, "I think [Vandergaw]'s a liar." Ex. 3 at 75. U.S. Attorney S. Lane Tucker states, "I wouldn't trust her to do anything. I don't think she's honest." Ex. 4 at 49. She further explains:

> I think she violated a whole bunch of rules of professional responsibility. I think it indicates a remarkable lack of judgment and a lack of candor and honesty…it's so wrong on so many levels that [she] shouldn't be a lawyer at all.

*Id.*

### III. Legal Standard

Federal Rule of Criminal Procedure 33(a) provides that on a defendant's motion, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Given that the current presiding judge in this matter did not preside over the trial, Federal Rule of Criminal Procedure 25(b) gives this Court additional authority to grant a new trial. Rule 25(b)(1) provides that "[a]fter a verdict or finding of guilty, any judge regularly sitting in or assigned to a court may complete the court's duties if the judge who presided at trial cannot perform those duties because of absence, death, sickness, or other disability." Under Rule 25(b)(2), "[t]he successor judge may grant a new trial if satisfied that: (A) a judge other than the one who presided at the trial cannot perform the post-trial duties; or (B) a new trial is necessary for some other reason."

18

## IV. Argument

### a. Judge Kindred's conduct violated Mr. Keays fundamental rights to a fair trial and impartial judge, warranting a new trial.

Judge Kindred was not a fair, impartial arbiter in this case given his undisclosed sexual relationship with two members of the U.S. Attorney's Office. Contemporaneous with the trial, he was making decisions that demonstrated a complete lack of judgment or respect for the integrity of the judicial process. This Court, therefore, can place no trust in Judge Kindred's many decisions leading up to and during trial. Nor can the public trust the integrity of this conviction. A new trial is required.

Unbeknownst to the defense at the time, Judge Kindred presided over this matter while embroiled in a controversy involving multiple current or former employees of the U.S. Attorney's Office. He actively took a day off from Mr. Keays' trial to appear in front of the Ninth Circuit's Judicial Council that was investigating his actions. Mid-trial, he lied under oath to the Judicial Council about his sexual misconduct until he was confronted by physical, contemporaneous evidence and had no choice but to acknowledge the misconduct. Three months later, that body requested that Judge Kindred voluntarily resign. With Mr. Keays' post-trial motions still pending before him, Judge Kindred resigned.

Judge Kindred was statutorily required to recuse prior to trial given the open investigation into his misconduct with employees of the U.S. Attorney's Office. Under 28 U.S.C. § 455(a), a judge must "disqualify himself in any proceeding in which his impartiality might reasonably be questioned." "[R]ecusal is appropriate whe[n] 'a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned." *United States v. Carey*, 929 F.3d 1092, 1104 (9th Cir. 2019) (quoting *Yagman v. Republic Ins.*, 987 F.2d 622, 626

19

(9th Cir. 1993)). "[I]mpartiality must be 'evaluated on an *objective* basis, so that what matters is not the reality of bias or prejudice but its appearance.'" *Carey*, 929 F.3d at 1104 (quoting *Liteky v. United States*, 510 U.S. 540, 548 (1994)).

A new trial is further warranted because Judge Kindred's decision to remain on this case violated Mr. Keays' right to a fair trial protected by the Due Process Clause of the Fifth Amendment. "A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness." *Turney v. Ohio*, 273 U.S. 510, 532 (1997). Like with Judge Kindred's statutory obligation under § 455(a), the relevant question, therefore, is "whether, as an objective matter, the average judge in his position is likely to be neutral, or whether there is an unconstitutional potential for bias." *Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016). The judge need not "harbor[] an actual, subjective bias" for recusal to have been appropriate. *Id.*

First, there is an unconstitutional potential for bias in this case that is undeniable and ineradicable. The integrity and character of Judge Kindred himself has been so thoroughly impugned not just by his sexual misconduct but by proceeding to lie under oath about that conduct to a judicial body. Judge Kindred began trial in this matter, took a break from trial during which he lied under oath to the Judicial Council, and returned to trial, all without informing Mr. Keays of the reason for his departure. Even beyond his confirmed perjury, Judge Kindred is now known to have been a judge who made decisions based on factors such as how low-cut of a blouse the moving attorney wore.

Judge Kindred made many critical decisions both pretrial and during trial regarding the admissibility of evidence and the jury instructions. There is no basis for concluding that those decisions were motivated by the impartial application of the law rather than extrajudicial

20

considerations. Given Judge Kindred's demonstrated lack of judgment and integrity, none of these decisions warrant any deference. A new decisionmaker must start anew in a new trial.

Second, allowing this verdict to stand would significantly erode public trust in the judiciary. Even if there were reason to conclude Judge Kindred was impartial in the trial, allowing a conviction and prison term to follow from a trial conducted under these circumstances would dismantle public trust in the judicial system. Protecting public trust in the judicial system is the very reason why the standard for recusal is governed by an objective rather than a subjective standard.

Third, while AUSA Vandergaw may not have been an attorney of record in this case, she was undoubtedly involved, and, given that neither AUSA Vandergaw nor AUSA Klugman are credible, the extent of her involvement cannot be determined. In *United States v. Hernandez-Zamora*, the court granted a motion for a new trial based entirely on the possibility of impartiality after AUSA Vandergaw appeared frequently in the courtroom during trial. Order, Case No. 3:21-cr-62-MAH, (D. Alaska, Dec. 9, 2024), ECF No. 406 at 10. The court found, "[Vandergaw's] presence and assistance—combined with her interactions and relationship with Judge Kindred— are circumstances under which a reasonable person would reasonably question Judge Kindred's impartiality. In addition, the Court concludes that the average judge in Judge Kindred's position was not likely to be neutral." *Id.*

Mr. Hernandez-Zamora had a benefit that Mr. Keays does not have: continuity of counsel. Mr. Hernandez-Zamora did not need AUSA Vandergaw to acknowledge her involvement in the case or her presence in the courtroom. His defense attorney could make those assertions on his behalf. His attorney was there.

Here, AUSA Vandergaw acknowledges a role in prosecuting Mr. Keays, and she acknowledges that she may have attended opening statements but claims that she cannot remember what other part of the trial, if any, she attended. Ex. 6 at 86, 88. AUSA Klugman, who was an attorney of record, also claims that AUSA Vandergaw played no further role, and he further claims that he never discussed the case with AUSA Vandergaw. AUSA Vandergaw, however, is confirmed to have lied to those investigating her own and Judge Kindred's misconduct. She has a reputation as a "liar." And AUSA Klugman has also earned a reputation for dishonesty amongst his superiors at the U.S. Attorney's Office. Neither is credible.

The levels of impropriety, dishonesty, and poor judgment pile on in this case to an astounding degree. The judge presiding over it committed perjury right in the middle of trial. One of the trial attorneys—AUSA Klugman, the very same who authored most of the pretrial motions, gave the opening statement, and examined the government's star witness—was dating and cohabitating with another Assistant U.S. Attorney—AUSA Vandergaw—who carried on an inappropriate relationship with Judge Kindred and lied to those investigating the nature of their relationship. And, even more concerning, AUSA Vandergaw has yet to acknowledge that her conduct violated professional ethics—although OPR has now acknowledged as much on her behalf. She claims not to know whether defendants have a right to know about the nude photographs she sent to Judge Kindred. AUSA Vandergaw may only admit to playing a minor role in Mr. Keays' prosecution and only once observing the proceedings, but her word cannot be trusted and should not be credited by this Court. AUSA Klugman may deny discussing the case with AUSA Vandergaw, yet he also has earned a reputation for dishonesty. Overall, the optics of Mr. Keays' trial are highly suspicious and throw the integrity of his proceedings into doubt.

### b. Even absent judicial misconduct, Judge Kindred's resignation alone warrants a new trial.

Mr. Keays moved for a new trial shortly after trial concluded. *See* ECF No. 296. That motion was never resolved prior to Judge Kindred's resignation and remains pending now.

One of the primary arguments in that motion is that the testimony by the government's cooperator was not credible for a myriad of reasons and should not have been credited by the jury. *Id.* at 3-6. The cooperator, Mr. Wright, was the government's only witness as to what Mr. Keays actually knew about the scheme. Judge Kindred observed that witness across multiple days of direct and cross examination. He observed Mr. Wright's demeanor during both sides' examinations. If this Court were to rule on the preexisting motion for a new trial based solely on a cold reading of the trial record, the Court would be effectively playing the role of an appellate court, not the trial court. For good reason, appellate courts defer to trial judges' credibility findings. "[O]nly the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985).

To be sure, this Court is not categorically barred from resolving Mr. Keays original motion for a new trial just because the motion hinges on credibility concerns. *See United States v. Cloud*, Case No. 22-30173, 2024 WL 49808 (9th Cir. Jan. 4, 2024) (citing *Carbo v. United States*, 314 F.2d 718, 749-50 (9th Cir, 1963)). The Ninth Circuit has previously allowed judges who stepped in after trial under Rule 25 to resolve post-trial motions like that originally filed by Mr. Keays even when witness credibility is at issue if the substitute judge "'demonstrate[s] his familiarity with the case' by meticulously detailing the evidence presented at trial and recounting at length the testimony of the key witnesses." *Id.* (quoting *United States v. Spinney*, 795 F.2d 1410, 1413 (9th Cir. 1986)).

Yet, Mr. Keays' case is unique for several reasons. A judge who himself has been found not credible by a judicial body presided over the trial. Almost all the parties in the case have changed since trial. Judge Kindred resigned. Mr. Keays was appointed new counsel after running out of funds to continue with his chosen counsel. AUSA Klugman was replaced as trial counsel. Of all the parties consistently present throughout trial, including Judge Kindred, two defense attorneys, and two AUSAs, only one AUSA remains on this case.

The only defense Mr. Keays raised was knowledge. He did not challenge that ConocoPhillips was defrauded, only that he was a knowing participant in that fraud. The government's only witness as to Mr. Keays' state of mind was Mr. Wright. That witness's credibility is in question. And out of all those who participated in Mr. Keays' trial, only one attorney remains. A fair adjudication of the arguments in Mr. Keays' preexisting motion for a new trial would be impossible.

### c. Granting a new trial is a reasonable, middle-ground approach that protects the interests of all parties.

Mr. Keays has not sought the more drastic remedy of dismissal. This Court has the power to dismiss this indictment entirely under its inherent supervisory powers. *See United States v. Bundy*, 968 F.3d 1019, 1030 (9th Cir. 2020). Recognizing that remedy would be "drastic" and that the lesser remedy of a new trial is available, Mr. Keays has not sought it. *Id.* at 1031.

Granting Mr. Keays a new trial protects the interests of all parties. The violation of Mr. Keays' right to a fair trial and impartial judge will be cured. The government will not be disadvantaged simply by requiring them to prove their case again. If the government can prove its case before an impartial judge, then the parties will be in the same position as they currently stand, this time with a trial that upholds values central to our justice system: impartiality and fairness.

24

**V.     Conclusion**

Mr. Keays' guilty verdict was rendered under the shadow of sexual misconduct and perjury. He faces a multi-year prison sentence following a trial presided over by a judge who had to take time off from trial to testify about his own sexual misconduct to a judicial body. During that testimony, he lied under oath. Allowing that verdict to stand would deteriorate public trust in the judicial system. On the other hand, granting him a new trial would not disadvantage any party. A new trial is warranted here.

DATED June 26, 2025

RENE L. VALLADARES
Federal Public Defender

By:     *s/ Allie Wilson*
Allie Wilson
Assistant Federal Public Defender
Counsel for Defendant Nathan Keays

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 26, 2025, a copy of the foregoing **Defendant's Supplemental Motion for a New Trial Pursuant to Federal Rules of Criminal Procedure 25 and 33** was served electronically using the district court's CM/ECF system to the following attorneys of record:

Steven Clymer: Steven.D.Clymer@usdoj.gov

Michael Heyman: Michael.Heyman@usdoj.gov

Adam Alexander: Adam.Alexander@usdoj.gov


/s/Katrina Burden
Employee of the Federal Public Defender

26